UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL INSURANCE COMPANY, as
Subrogee of Barbara Ann Karmanos                Case No. 08-13322
Cancer Institute

                                             Honorable Nancy G. Edmunds

        Plaintiff,

v.

THE DETROIT MEDICAL CENTER,

        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT [7]**

    This diversity action arises out of damage to a specialized piece of radiation therapy equipment known as a Tomo Therapy High Art Therapy System ("the Karmanos Equipment") owned by the Barbara Ann Karmanos Cancer Institute ("Karmanos").  The damage was allegedly caused on September 4, 2007, when a sump pump failed to pump waste water out of the sump pits and waste water backed up through a floor drain in the room where the Karmanos Equipment was housed.  The Karmanos Equipment was insured by Plaintiff Federal Insurance Company ("Plaintiff Insurer").

    Under the terms of its policy with Karmanos, Plaintiff Insurer paid Karmanos $2,546,576 for property damage to the Karmanos Equipment housed in premises Karmanos leased from a Detroit Medical Center ("DMC") affiliate, the Detroit Receiving Hospital and University Health Center ("DRH").  Plaintiff Insurer then brought this action, as subrogee of its insured Karmanos, against the DMC asserting breach of contract and

negligence claims.  The complaint alleges that the DMC breached its maintenance agreement with Karmanos when it negligently maintained the sump pumps on property leased by Karmanos.

This matter is now before the Court on Defendant DMC's motion for summary judgment.  Defendant's motion is GRANTED.  Plaintiff Insurer's claims are barred by a valid and enforceable waiver of subrogation clause contained in a contract signed by its insured, Karmanos.[1]

## I.    Facts

On November 30, 2005, Karmanos signed two related agreements in connection with its lease of property from Detroit Receiving Hospital:  (1) a ROC[2] Ground Lease ("Ground Lease"), and (2) a Facilities Maintenance, Access, Easement and Cost-Sharing Agreement (the "Maintenance Agreement").   The Maintenance Agreement is incorporated into the Ground Lease and attached as an exhibit:

> 7.  Maintenance and Repair of Leased Premises.  The Parties acknowledge and agree that the Facility Maintenance Agreement sets forth the respective obligations of the Parties with respect to maintenance, repair and replacement of the Leased Premises and the payment of the costs incurred in connection therewith.  A copy of the Facility Maintenance Agreement is attached hereto as Exhibit G and incorporated herein.

---

[1]Plaintiff Insurer's negligence claim is barred for an additional reason.  There is no duty separate from the contractual duty under the Maintenance Agreement.  Accordingly, under Michigan law, any breach of that contractual duty gives rise at most to a breach of contract claim, not a separate negligence claim.  *See Fultz v. Union-Commerce Assoc.*, 683 N.W.2d 587 (Mich. 2004).

[2]Under the terms of the Ground Lease, "ROC" means "the Aaron and William Gershenson Radiation Oncology Center. . . ."  (Def.'s Ex. B, ROC Ground Lease at ¶ 1.31.)

(Def.'s Ex. B, 11/30/05 ROC Ground Lease at ¶ 7.)  Similarly, the Maintenance Agreement references the ROC Ground Lease:

> 15.3    <u>Entire Agreement</u>.  This Agreement, including the exhibits and exhibits attached here, the ROC Ground Lease and Master Deed, embody the entire agreement and understanding between the Parties hereto as of the date hereof with respect to the subject matter hereof.  There are no other agreements or understandings, oral or written, among the Parties with respect to the subject matter, and this Agreement supersedes all previous negotiations, commitments and writings with respect to the subject matter hereof.  No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the Parties or authorized representative of the Parties, including The DMC.

(Def.'s Ex. C, 11/30/05 Maintenance Agreement at ¶ 15.3.)

The relevant terms of the ROC Ground Lease and the Maintenance Agreement are as follows.

**A.  The ROC Ground Lease**

The ROC Ground Lease, executed on November 30, 2005, is between Detroit Receiving Hospital and University Health Center ("DRH") as Landlord and Karmanos as Tenant.  The introductory paragraphs explain that Karmanos, the DMC, and other affiliates of the DMC[3] are parties to an August 24, 2004 Asset Acquisition and Lease Agreement, as amended ("Asset Acquisition Agreement").  Under that Asset Acquisition Agreement, the DMC and some of its affiliates agreed to sell and lease to Karmanos certain property and assets for its use in establishing an independent and financially freestanding cancer

---

[3]The ROC Ground Lease defines "The DMC Affiliates," "The DMC and its Affiliates," and "The DMC or its Affiliates" as "The Detroit Medical Center, Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Harper-Hutzel Hospital, Huron Valley - Sinai Hospital, the Rehabilitation Institute of Michigan, Sinai Hospital of Greater Detroit and other current and future subsidiaries and affiliates of The DMC."  (ROC Ground Lease at ¶¶ 1.44, 1.45.)

hospital on the DMC Main Campus.  Also, under Section 4.1 of that Agreement, the DRH agreed to lease the Aaron and William Gershenson Radiation Oncology Center (the "ROC") to Karmanos.  The ROC Ground Lease is that promised long-term ground lease between the DRH and Karmanos.  (ROC Ground Lease at 1.)

    **1.  The DRH, as Landlord, Appoints The DMC as its Representative**

Under Section 2.1 of the ROC Ground Lease, the DRH, as Landlord, appointed the DMC as its representative, giving it full power and authority to act on its behalf as long as the DRH is directly or indirectly controlled by the DMC:

    2.  <u>Appointment of Landlord's Representative and Leased Premises</u>.

> 2.1    <u>Appointment of Landlord's Representative</u>.  Landlord hereby appoints The DMC as its representative under this Lease and grants The DMC full power and authority to act on behalf of Landlord hereunder as long as Landlord is a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC.  This grant by the Landlord to The DMC shall be a power coupled with an interest and shall be irrevocable as long as Landlord is a wholly-owned subsidiary of, or directly or indirectly controlled by The DMC.  During the term of such appointment, Tenant shall deal exclusively with The DMC with respect to all matters arising under this Lease.  The appointment of The DMC as the representative of Landlord under this Lease shall automatically terminate in the event that Landlord is no longer a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC.  The DMC is not a party to this Lease except solely for the purpose of acknowledging that it will exercise the authority granted to it in Section 2.1 while serving as the representative of Landlord.

(ROC Ground Lease at ¶ 2.1.)

Consistent with Section 2.1, the DMC executed the ROC Ground Lease under this limiting language:  "The DMC executes this Lease solely for the purpose of acknowledging that it will exercise the authority granted to it in Section 2.1 while serving as the representative of Landlord."  (ROC Ground Lease at 36.)

4

2.  **Insurance Provisions and Waiver of Subrogation Under ROC Ground Lease**

The ROC Ground Lease allocates the expense of insurance coverage and the insured risks between the Landlord (DRH) and the Tenant (Karmanos).  Karmanos, as Tenant, was required to  maintain insurance coverage for "such risks and in such amounts as shall be required from time to time under its loan agreements and indentures." (ROC Ground Lease at ¶ 11.1.)  Absent such loan agreements or indentures, Karmanos was required to maintain insurance coverage "covering such risks and in such amounts as is customary for hospitals located in Southeast Michigan," and covering "the Leased Premises. . . with Landlord being an additional insured." (*Id.*)[4]  The DRH, as Landlord, was required to do the same for "the Building. . . ."  (ROC Ground Lease at ¶ 11.2.)  "Building" is defined in the

---

[4]Stated more fully, Section 11.1 provides that:

> 11.1.  Tenant.  Tenant shall, at all times during the Term, and at Tenant's sole cost and expense, maintain in effect insurance (or self insurance) covering such risks and in such amounts as shall be required from time to time under its loan agreements or indentures.  In the absence of such loan agreements or indentures, Tenant shall, at all times during the Term, and at Tenant's sole cost and expense, maintain in effect insurance covering such risks and in such amounts as is customary for hospitals located in Southeast Michigan.  At all times, such insurance shall cover the Leased Premises and include, but not be limited to (a) broad form fire and extended coverage insurance with an all-risk endorsement against loss or damage by fire, lightening, windstorm, hail, explosion, riot and civil commotion, damage from aircraft and vehicle, smoke damage and such other risks as are from time to time typically included in 'all risk' forms in Wayne County, Michigan, in an amount not less an the full replacement value of the improvements, exclusive of the cost of foundations, excavation, and footings, without deduction for depreciation, and with loss payable during the Primary Term to Landlord and Tenant, with Landlord being an additional insured, . . . .

(ROC Ground Lease at ¶ 11.1 (emphasis added).)

5

ROC Ground Lease as "the hospital buildings and facilities of Landlord, that are located on the DMC Main Campus other than the Leased Premises." (ROC Ground Lease at ¶ 1.3.)

Key to this litigation, the ROC Ground Lease contains the following provision where both Karmanos, as Tenant, and the DRH, as Landlord, broadly waive "any and all" subrogation claims:

> 11.5 <u>Mutual Waiver of Subrogation</u>. Landlord and Tenant, for themselves and their respective successors and assigns (including, without limitation, any person or entity which may become subrogated to any of their respective rights), hereby waive <u>any and all rights and claims for recovery against the other, and their respective</u> directors, officers, partners, employees, <u>agents</u> and assigns, or any of them, <u>on account of any loss or damage</u> to <u>any of their respective properties insured under any valid and collectible insurance policies</u>, to the extent of any recovery collectible under such insurance policies. To the extent reasonably available, <u>each insurance policy carried by Tenant and Landlord</u> pursuant to this Section 11 <u>shall provide that the insurance company waives all right of recovery by way of subrogation against the other Party</u>.

(ROC Ground Lease at ¶ 11.5 (emphasis added).)

### 3. Miscellaneous Provisions of ROC Ground Lease

The ROC Ground Lease also provides that: (1) it is to be "construed, enforced and interpreted" under Michigan law (*id.* at ¶ 19.4), (2) it can be modified only by a signed writing (*id.* at ¶ 19.3), (3) "no presumptions shall arise favoring any party by virtue of authorship of any of its provisions" (*id.* at ¶ 19.13), (4) "[t]he exhibits and other documents attached" to the lease "or incorporated by reference herein form an integral part of this Lease and are hereby incorporated into this Lease wherever reference is made to them as to the same extent as if they were set out in full at the point at which such reference is made" (*id.* at ¶ 19.14), and (5) the Maintenance Agreement is attached as an exhibit to the ROC Ground Lease and incorporated by reference (*id.* at ¶ 7).

**B.  Maintenance Agreement**

The Maintenance Agreement was also executed on November 30, 2005, among the following:

1.  Barbara Ann Karmanos Cancer Hospital, doing business as the Karmanos Cancer Center ("KCC");
2.  the DMC;
3.  Harper-Hutzel Hospital ("HHH"), an affiliate of the DMC;
4.  Detroit Receiving Hospital and University Health Center ("DRH"), also an affiliate of the DMC; and
5.  the Webber North Hudson-Webber Condominium Association (the "Association").

(Maintenance Agree. at 1.)

The introductory paragraph expressly provides that "[r]eferences to The DMC shall include, to the extent applicable, HHH and DRH." (*Id.*)

Other introductory paragraphs, similar to those in the ROC Ground Lease, explain that the Karmanos Cancer Institute, "The DMC, HHH and certain other affiliates of The DMC are parties to an Asset Acquisition and Lease Agreement dated August 24, 2004, as amended, pursuant to which The DMC and certain affiliates of The DMC agreed to sell and lease to KCC certain property and assets for use in connection with the establishment by KCC of an independent and financially freestanding cancer hospital on the DMC Main Campus." (*Id.*)

Pursuant to the Asset Acquisition Agreement, HHH also created a two unit condominium located on the DMC Main Campus. (*Id.*) HHH is the owner of Unit 1 "which contains certain inpatient units and outpatient departments of Harper University Hospital;" and KCC is the owner of Unit 2 "which contains certain inpatient and outpatient departments of the Karmanos Cancer Center." (*Id.* at 2.)

7

In addition, DRH is "leasing the Aaron and William Gershenson Radiation Oncology Center (the 'ROC') to KCC under the terms of the ROC Ground Lease;" and "The DMC and HHH are granting certain easements and licensing rights to KCC." (*Id.*)

Moreover, "The DMC is providing certain utilities services and repair, maintenance and replacement services to the Condominium, the ROC and the property that is subject to the easement and licensing rights." (*Id.*) Finally, the Association "is responsible for the management, maintenance, operation and administration of the General Common Elements, easements and affairs of the Condominium." (*Id.* at 1.)

### 1.   DRH's Appointment of The DMC as its Representative

Key to this dispute is Section 2.2. There, similar to the ROC Ground Lease, the DRH appoints the DMC as its representative under the Maintenance Agreement, giving it full power and authority to act on its behalf, as long as the DRH "is a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC." (Maintenance Agree. at ¶ 2.2.) The DMC is also appointed as HHH's representative under the Agreement. (*Id.* at ¶ 2.1.) The full text of Section 2.2 is as follows:

2.   <u>Appointment of Representative of HHH and DRH</u>.

* * *

2.2   <u>DRH</u>. DRH hereby appoints The DMC <u>as its representative</u> under Agreement and <u>grants to The DMC full power and authority to act on behalf of DRH hereunder</u> as long as DRH is a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC. This grant by DRH to The DMC shall be a power coupled with an interest and shall be irrevocable as long as DRH is a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC. During the term of such appointment, KCC shall deal exclusively with The DMC with respect to all matters arising under this Agreement. The appointment of The DMC as the representative of DRH under this Agreement shall automatically

8

terminate in the event that DRH is no longer a wholly-owned subsidiary of, or directly or indirectly controlled by, The DMC.

(*Id.* at ¶ 2.2 (emphasis added).)

## 2. The DMC to Provide Maintenance to the ROC

Under the Maintenance Agreement, the DMC is to repair and maintain the ROC:

4.   Repair, Maintenance and Replacement Services.

* * *

4.3   The ROC.  The DMC shall provide Repair, Maintenance and Replacement Services for the Sub-Surface, Surface and Building Improvements of the ROC.  The DMC shall keep the Sub-Surface and Building Improvements of the ROC in good working order, condition, and repair and shall cause the Sub-Surface, Surface and Building Improvements of the Condominium to satisfy the Laws, Requirements and Standards; provided, however, that, in the event that a Capital Project is required in order for The DMC to meet the obligations set forth in this Section 4.3, the cost of the Capital Project shall be shared by The DMC and KCC in accordance with the provisions of Section 8 of this Agreement.  The DMC and KCC shall share the cost of the Repair, Maintenance and Replacement Services furnished by The DMC under this Section 4.3 in accordance with the provisions of Sections 6 and 8 of this Agreement.

(Maintenance Agree. at ¶ 4.3.)

## 3. Insuring Obligations

In separate paragraphs, the DMC and Karmanos were each required to maintain commercial insurance (or self insurance) "covering such risks and in such amounts as shall be required from time to time" under their respective "loan agreements or indentures." (Maintenance Agree. at ¶¶ 12.1, 12.2.)  In the absence of such "loan agreements or indentures," each was separately required, at its "sole cost and expense," to "maintain in effect insurance covering such risks and in such amounts as is customary for acute care hospitals located in Southeast Michigan."  (*Id.*)

9

There is no "waiver of subrogation" clause in the Maintenance Agreement.

**4. Miscellaneous Provisions**

The Maintenance Agreement also provides that (1) this Agreement and exhibits, the ROC Ground Lease, and the Master Deed "embody the entire agreement and understanding between the Parties" and there are no other written or oral "agreements or understandings" among the parties (*id.* at ¶ 15.3); (2) all exhibits to the Agreement or other documents attached to it or incorporated by reference "form an integral part of this Agreement and are hereby incorporated into this Agreement wherever reference is made to them as to the same extent as if they were set out in full at the point at which reference is made" (*id.* at ¶ 15.11); (3) to be effective, all modifications, waivers, or amendments to the Agreement must be "specifically made in writing and duly signed by the Parties or authorized representative of the Parties, including The DMC" (*id.* at ¶ 15.3); (4) the Agreement is to be "construed, enforced and interpreted" under Michigan law (*id.* at ¶ 15.4); (5) "no presumptions shall arise favoring any Party by virtue of authorship of any of [the Agreement's] provisions" (*id.* at ¶ 15.10); (6) "[w]henever references in this Agreement are to The DMC, they shall also be deemed to be references to the HHH and DRH, as the context requires, in order to give meaning to the true intent of the Parties to provide a binding obligation on The DMC, HHH and DRH" (*id.* at ¶ 15.5); (7) "[t]he provisions of this Agreement shall not inure to the benefit of, or be enforceable by, any person or entity other than KCI, KCC, The DMC, HHH, DRH and any permitted successor or assign" (*id.*); and (8) "[t]he parties acknowledge that The DMC is an independent contractor of KCC" and is not to be considered an "agent of KCC" (*id.* at ¶ 15.14).

**C. Plaintiff Insurer's Payment of Claim to Its Insured Karmanos**

10

It is undisputed that Plaintiff Insurer, pursuant to its property insurance policy with Karmanos, paid Karmanos $2,546,576 for property damage to the Karmanos Equipment housed in the Leased Premises under the ROC Ground Lease.  (Pl.'s Resp. at 1.)

### D.  Plaintiff Insurer Sues the DMC as Karmanos Subrogee

After paying Karmanos $2,546,576 under its property insurance policy, Plaintiff Insurer brought this action against the DMC as subrogee for Karmanos.  The complaint alleges that the DMC was negligent and breached the Maintenance Agreement when it allowed sewage pumps in a sump pit to fail over the Labor Day weekend thus causing waste water to back up through floor drains and damage the Karmanos Equipment.  (*Id.*; Compl.)

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most

11

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

This matter is now before the Court on Defendant DMC's motion for summary judgment. The DMC argues that, as DRH's agent, it is entitled to invoke the "Waiver of Subrogation" provision in the ROC Ground Lease between Karmanos and the DRH, thus barring Plaintiff's Insurer's subrogation claims asserted in this lawsuit. Because an insurance company can have no greater rights than its insured, the DMC argues, Plaintiff Federal Insurance Company is bound by its insured's broad waiver.

Plaintiff Insurer responds that the "waiver of subrogation" clause in the ROC Ground Lease (1) is ambiguous, thus requiring extrinsic evidence to discern the parties' intent; (2) was intended to narrowly apply solely to real property required to be insured under the insurance provisions of the ROC Ground Lease; and (3) does not apply to the DMC because, under the terms of that contract, the DMC is not DRH's agent. This Court disagrees with Plaintiff and GRANTS Defendant's motion for summary judgment.

The Court's task is two-fold. First, it must determine whether the contract language at issue is ambiguous or not. Under Michigan law, which governs this dispute, this is a question of law for the Court. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). Contract language is ambiguous if it is capable of two or more constructions, both

12

of which are reasonable.  *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).

Second, the Court must construe the contract.  This too is a question of law for the Court.

*Wilkie*, 664 N.W.2d at 780.  If the contract language is clear and unambiguous, the Court

must enforce it as written, giving effect to its plain meaning.  *Clevenger v. Allstate Ins. Co.*,

505 N.W.2d 553, 557 (Mich. 1993).  It does not consider extrinsic evidence.  *Upjohn Co.*

*v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 396 n.6 (Mich. 1991).

### A.  Waiver of Subrogation Clause Is Unambiguously Broad

Generally speaking, "[w]aivers of subrogation are common in leases, construction

contracts, . . . and other documents. . . .In commercial agreements parties often negotiate

to 'waive' the right of their insurer to claim against the wrongdoer after paying a loss. . .

.The economic result of the waiver of subrogation is that the insurer alone bears the risk

of loss; once the loss is paid, the matter ends, and there are no follow-on lawsuits."  Peter

S. Britell, Patrice D. Stavile and Mie Ono, *Waivers of Subrogation in a Nutshell*, 235

N.Y.L.J. 9 (Mar. 27, 2006).  The waiver thus benefits both parties by "prevent[ing] lawsuits

and divisiveness between parties in on-going commercial relationships, such as

commercial leases or construction contracts."  *Id.* at 10.  Waivers of subrogation also have

an economic advantage.  "It costs more to have multiple parties pay premiums on a single

risk."  *Id.* at 11.

The waiver of subrogation clause at issue here allocates the costs and risks of

property loss or damage between the Landlord/DRH and Tenant/Karmanos.  Because the

broad language of this clause is not capable of two or more reasonable constructions, it is

unambiguous.  It evidences the parties' intent to look only to their own property insurance,

and not to each other, to recover for loss or damage to their respective properties

13

whenever that damaged or lost property is covered by a valid and collectible insurance policy. *See Hastings Mut. Ins. Co. v. Teeple*, No. 262299, 2005 WL 3416151, *2 (Mich. Ct. App. Dec. 13, 2005). "This allocation of risk also allows the parties to avoid subrogation exposure." *Id.* This is true because, under Michigan law, "[a] subrogee acquires no greater rights than those possessed by its subrogor." *Indiana Ins. Co. v. Erhlich*, 880 F. Supp. 513, 517 (W.D. Mich. 1994) (applying Michigan law).

## B. Waiver Is Not Limited to Particular Insurance Policies

Contrary to Plaintiff Insurer's arguments, the waiver of subrogation clause broadly covers "any valid and collectible insurance policy." This unambiguous language includes the $2,546,576 insurance claim paid by Plaintiff Insurer to Karmanos for property damage to the Karmanos Equipment. Straight-forward application of Michigan's rules of contract interpretation supports this conclusion.

The all-encompassing term "any" is used repeatedly in the waiver of subrogation clause. Both Landlord/DRH and Tenant/Karmanos contractually waive "any and all rights and claims for recovery" against the other and their "agents" with regard to "any loss or damage to any of their respective properties insured under any valid and collectible insurance policies, to the extent of the recovery collectible under such insurance policies." (ROC Ground Lease at ¶ 11.5 (emphasis added).) Michigan law treats terms like "any" and "all" as unambiguously broad, leaving no room for exceptions. *See Romska v. Opper*, 594 N.W.2d 853, 856 (Mich. Ct. App. 1999) (observing that "[t]here cannot be any broader classification than the word 'all,' and 'all' leaves room for no exceptions.") (internal quotations and citation omitted); *Skotak v. Vic Tanny Int'l, Inc.*, 513 N.W.2d 428, 430 (Mich. Ct. App. 1994) (making the same observation for the phrase "any and all").

14

Giving effect to its plain language, the scope of the waiver clause is not limited to and co-extensive with the insurance policies required to be purchased under Sections 11.1 and 11.2 of the ROC Ground Lease.  Rather, it broadly includes "properties insured under <u>any valid and collectible insurance policies</u>, to the extent of any recovery collectible under such insurance policies." (*Id.* (emphasis added).)  It is undisputed that Plaintiff paid Karmanos $2,546,576 for property damage to the Karmanos Equipment.  Accordingly, the waiver applies because Karmanos recovered under a "valid and collectible insurance polic[y]." (*Id.*)  Plaintiff's arguments to the contrary are rejected.[5]  Under Michigan law, this Court is required to give effect to the plain language and broad terms of this waiver of subrogation clause.[6]

### C.  Waiver Extends to Any of the Parties' Insured Properties

Plaintiff Insurer next argues that the waiver is limited to and co-extensive with the "Leased Premises" required to be insured by Karmanos under Section 11.1 of the ROC Ground Lease.  Again, the plain, unambiguous language of the waiver clause defeats this argument.  It provides for the waiver of "<u>any and all</u> rights and claims for recovery against the other . . . on account of <u>any loss or damage</u> to <u>any of their respective properties</u> insured

---

[5]Plaintiff Insurer's narrow interpretation also ignores the plain language of the insuring clauses.  Karmanos's obligation to purchase insurance also applies to any insurance required "under its loan agreements or indentures." (ROC Ground Lease at ¶ 11.1.)  As the DMC points out, Plaintiff Insurer presents no evidence showing that its insured, Karmanos, was not required to insure the damaged equipment "under its loan agreements or indentures."

[6]This Court's interpretation of the waiver clause does not conflict with its construction of the insuring clauses in the ROC Ground Lease.

under <u>any valid and collectible insurance policies</u>, to the extent of <u>any recovery collectible</u> under such insurance policy."  (ROC Ground Lease at ¶ 11.5 (emphasis added).)

The waiver clause uses the broad phrase "any of their respective properties," not the narrower, defined term "Leased Premises" that is used in Section 11.1.  Giving effect to the plain meaning of the broad term "any" as well as the plural term "properties," this phrase includes the Karmanos Equipment insured by Plaintiff under its policy with Karmanos.  It would be inappropriate for the Court to change the meaning of that broad waiver clause by adding the limiting term "leased" before the broader term "properties."  There is no basis in the contract for doing so.  It is undisputed that, under the terms of a valid and collectible insurance policy, Karmanos recovered $2,546,576 for property damage to the Karmanos Equipment.  Accordingly, Plaintiff Insurer, as Karmanos's subrogee, has waived the right to assert a claim against the DMC seeking to recover that $2,546,576 payment.

Plaintiff Insurer's reliance on parol evidence -- the Bennett Declaration -- to create a genuine issue of material fact as to the scope of the waiver clause likewise fails.[7]  Because

_____

[7]In an attempt to create a genuine issue of material fact as to the scope of the waiver of subrogation claim, Plaintiff Insurer proffers the Declaration of William Bennett, the Senior Vice President of Business Development for the Barbara Ann Karmanos Cancer Hospital. At the time the ROC Ground Lease and Maintenance Agreement were negotiated, Bennett was the Chief Financial Officer for Karmanos and was involved with the negotiations.  (Pl.'s Ex. E, Bennett Decl. ¶ 1.)  His Declaration does not address the agency relationship between DRH and the DMC.  It does, however, address the scope of the waiver clause. Ignoring the broad language of that clause, he claims the parties intended a far narrower application:

> 2.    The Waiver of Subrogation Clause in the ROC Lease and the insuring obligation clauses which precede the Waiver of Subrogation Clause were intended to apply to the properties which were the subject of the Asset Acquisition Agreement and ROC Ground Lease, namely, the leased premises and the buildings and other parts of real property which were the subject of those agreements.

its language is unambiguous, "resort to allegedly contradictory parol evidence" is "thereby preclude[d]." *Romska*, 594 N.W.2d at 857.  Under these circumstances, Michigan law requires that the intended scope be determined by the objective language of that clause and not by the subjective intent of one party's representative.  *See Amerisure Ins. Co. v. MBM Fabricators Co.*, Nos. 231753, 236242, 237616, 2002 WL 31934121, *1 (Mich. Ct. App. Nov. 19, 2002) (affirming the dismissal of a subrogation claim for recovery of fire loss benefits paid to the plaintiff's insured because the unambiguous language in the plaintiff's contract with the defendant waived subrogation claims and observing that "[t]he scope of a waiver is governed by the intent of the parties as expressed in the contract"); *Central States Pension Fund v. Melody Farms, Inc.*, 969 F. Supp. 1034, 1041 (E.D. Mich. 1997) (observing that "[c]ontractual intent is concerned with objective manifestations of intent, not with the subjective, hypothetical, unexpressed or nonexistent intentions of the parties.") (internal quotations and citation omitted).

Having determined that the Karmanos's property damage claim paid by Plaintiff Insurer falls within the scope of the waiver clause, this Court now considers whether the DMC can reap the benefit of that waiver clause.

### D.  The DMC Falls Within the Scope of the Waiver

Plaintiff also argues that the DMC does not fall within the scope of the waiver clause because it is not identified as DRH's agent under the ROC Ground Lease.  To accept this argument, the Court must ignore the plain meaning of the term "agent."[8]  As defined in

---

(*Id.* at ¶ 2.)

[8]Agency is a question of law when based on an unambiguous contract.  *See Birou v. Thompson-Brown Co.*, 241 N.W.2d 265, 268 (Mich. Ct. App. 1976) (observing that "where

*Black Law Dictionary* 64 (7th ed. 1999), an "agent" is "[o]ne who is authorized to act for or

in place of another; a representative." Michigan law similarly defines "agent." In *St. Clair*

*Intermediate School District v. Intermediate Education Association*, 581 N.W.2d 707, 716

(Mich. 1998), the Michigan Supreme Court observed that:

> Under the common law of agency, in determining whether an agency has
> been created, we consider the relations of the parties as they in fact exist under
> their agreements or acts and note that in its broadest sense agency includes
> every relation in which one person acts for or represents another by his
> authority.

(internal quotations and citations omitted). *See also Uniprop, Inc. v. Morganroth*, 678

N.W.2d 638, 641 (Mich. Ct. App. 2004) (observing that "[a] characteristic of an agent is that

he is a business representative.").

It is uncontested that DRH appointed the DMC as its "representative." The plain,

unambiguous language of the ROC Ground Lease, appoints the DMC as DRH's

representative in numerous places. For example, under Section 2.1, the DRH, as Landlord,

appointed the DMC as its representative, giving it full power and authority to act on its

behalf. Consistent with Section 2.1, the DMC executed the ROC Ground Lease under this

limiting language: "The DMC executes this Lease solely for the purpose of acknowledging

that it will exercise the authority granted to it in Section 2.1 while serving as the

representative of Landlord." (ROC Ground Lease at 36.)

The Maintenance Agreement, which Plaintiff as subrogee for Karmanos alleges was

breached by the DMC, is an exhibit to the ROC Ground Lease and incorporated into that

Lease. (ROC Ground Lease at ¶¶ 7, 19.14.) Under Section 2.2 of the Maintenance

the relationship of the parties had been defined by written agreement, it is the province of
the trial judge to determine the relationship.").

Agreement, the DRH similarly appoints the DMC as its representative, giving it full power and authority to act on its behalf with regard to that Agreement.  (Maintenance Agree. at ¶2.2.)  Consistent with that provision, Section 15.3 states that, to be effective, all modifications, waivers, or amendments to the Maintenance Agreement must be "specifically made in writing and <u>duly signed by the Parties or authorized representative of the Parties, including The DMC</u>."  (*Id.* at ¶ 15.3 (emphasis added).)  Likewise, Section 15.5 provides that references to "The DMC" "shall also be deemed to be references to the . . . DRH, as the context requires, in order to give meaning to the true intent of the Parties to provide a binding obligation on The DMC . . . and DRH."  (*Id.* at ¶ 15.5.)

Plaintiff Insurer argues that, absent contract language giving DRH the right to control the DMC, it cannot be considered its agent.  This Court disagrees.  Here, there is no respondeat superior issue where the "right to control" would be relevant.  Control is a factor in deciding agency when that relationship is denied by the principal or agent and a third party seeks to impute acts of an alleged agent to a principal.  The DMC and DRH do not deny that an agency relationship is created under the language of the Maintenance Agreement (Def.'s Reply at 4).  In contrast, under Section 15.14, of that Agreement, the DMC and Karmanos expressly disavow an agency relationship:

> 15.14.  <u>Independent Contractors</u>.  The parties acknowledge that The DMC is an independent contractor of [Karmanos].  In no event will The DMC be deemed a joint venture, partner, employee, or agent of [Karmanos].

(Maintenance Agree. at ¶ 15.14.)  Absent a similar disavowal between the DMC and DRH, the contract as a whole provides additional support for this Court's conclusion that the DMC is DRH's agent and thus falls with the scope of the waiver of subrogation clause.

## IV.  Conclusion

For the above-stated reasons, Defendant DMC's motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 16, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 16, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager